**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

REPUBLICAN NATIONAL COMMITTEE; REPUBLICAN PARTY OF TEXAS; RONNY JACKSON; CAROLINE FAIRLY; JACE YARBROUGH; and ERIC FLORES,

*Plaintiffs*,

v.

FEDERAL COMMUNICATIONS COMMISSION; BRENDAN CARR, in his official capacity as a Commissioner and the Chairman of the Federal Communications Commission; ANNA M. GOMEZ, in her capacity as a Commissioner of the Federal Communications Commission; OLIVIA TRUSTY, in her capacity as Commissioner of the Federal Communications Commission; DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as Attorney General of the United States; FEDERAL ELECTION COMMISSION; SHANA BROUSSARD, in her official capacity as a Commissioner and the Acting Chair of the Federal Election Commission; and DARA LINDENBAUM, in her official capacity as a Commissioner of the Federal Election Commission,

*Defendants*.

Case No. ____________________

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs the Republican National Committee (RNC), the Republican Party of Texas (RPT), Ronny Jackson, Caroline Fairly, Jace Yarbrough, and Eric Flores allege as follows:

## INTRODUCTION

1. If the First Amendment means anything, it is that the government may not saddle disfavored speakers with special burdens, especially when it comes to their political speech. That is why California may not slap onerous disclosure requirements on crisis pregnancy centers but not the clinics selling contraceptives across the street. *NIFLA v. Becerra*, 585 U.S. 755, 777-78 (2018). It is why Vermont may not bar advertisers from buying information about prescriptions while letting academics do so. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563, 580 (2011). And it is why the federal government may not burden campaign speech on the basis of a speaker's identity. *Citizens United v. FEC*, 558 U.S. 310, 350-51 (2010).

2. Yet since 1971, Congress has done just that. As part of a larger (and unconstitutional) effort to reduce campaign costs and level the political playing field, the Federal Election Campaign Act of 1971 (FECA or Act), forces political parties to pay far more for campaign ads than the candidates they support or oppose. Specifically, in the runup to an election, FECA's lowest unit charge (LUC) requirement compels broadcasters, on pain of penalty, to set the "charges made for the use of any broadcasting station by any person who is a legally qualified candidate for any public office in connection with his campaign" at the "lowest unit charge"—*i.e.*, the rate they give their most favored commercial advertisers. 47 U.S.C. § 315(b)(1)(A). Backed by this edict, a candidate's *campaign* committee can secure campaign ads at rates an order of magnitude below market price. But if a *party* committee wants to run its own ads opposing the same candidate, it must pay full freight. By forcing "party committees to pay more for advertising space," this requirement hinders "their efforts to reach the electorate in the critical weeks leading up to" an election, thereby severely burdening "their First Amendment rights." *NRCC v. Brown*, 2026 WL 2618462, at *2 (U.S. Sept. 4, 2026).

3. The burden does not fall on parties alone. Because it is only "'natural for a party and its candidate to work together and consult with one another during the course of the election,'" the LUC requirement also harms *candidates* who coordinate with their parties on campaign ads, including on their "content, timing, or placement." *NRSC v. FEC*, 609 U.S. 908, 917-18 (2026). The government recently asserted that although the LUC extends to party ads that formally "announc[e] the candidate's approval in the advertisement itself," it "does not cover advertising by the party after mere consultation with the candidate," notwithstanding the fact that such ads are likewise party "'coordinated'" speech. U.S. Br. at 27, *NRCC*, 2026 WL 2584496 (No. 26A274) (*NRCC* Br.); *see NRSC*, 609 U.S. at 617. The ongoing enforcement of the LUC requirement therefore penalizes candidates—and parties—who exercise their constitutional right to consult with one another on core political speech.

4. This drag on First Amendment freedoms puts Plaintiffs—the RNC, the RPT, and various Republican candidates in Texas—at a competitive disadvantage by distorting the political landscape in favor of Democrats. While Democratic candidates generally have substantially more cash on hand than their Republican counterparts, they lack party committees with the financial resources of their Republican analogues. That is why Democratic party committees have recently boasted that by prohibiting the use of "party committee money for lowest unit charge ads," the LUC requirement gives their candidates "a fundamental advantage in the midterms."[1] The upshot is that the outcome of elections may turn on Congress's choice of whom to favor in the LUC requirement rather than on voters' choice of whom to favor at the polls.

[1] Barber & Merz, *DSCC, DCCC Statement on Fourth Circuit Decision Holding Political Party Committees & Joint Fundraising Committees Not Entitled to Lowest Unit Charge* (Aug. 25, 2026), https://perma.cc/7NY7-UGJA.

5. The Constitution demands better. "The First Amendment embodies our choice as a Nation" that when it comes to political speech, "the guiding principle is freedom—the 'unfettered interchange of ideas'—not whatever the State may view as fair." *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 750 (2011). The government therefore cannot reduce "the political participation of some in order to enhance the relative influence of others," nor enhance the political participation of some in order to reduce the relative influence of others. *McCutcheon v. FEC*, 572 U.S. 185, 191 (2014) (plurality). That is why Congress cannot force newspapers, for instance, to provide significant discounts on advertising space to candidates alone in order to make campaigns less expensive and more equitable. Compelling broadcasters to take the same step is just as unconstitutional. No matter the medium, the government cannot intervene to shape the discourse around elections, as "those who govern should be the *last* people to help decide who *should* govern." *Id.* at 192.

6. To cure this ongoing constitutional violation, this Court should declare that the LUC requirement—to the extent it entitles only candidates and not political party committees (whether independently or in coordination with candidates) to purchase broadcast political advertising time at the LUC—violates the First Amendment and is therefore unenforceable *unless* it is enforced to likewise entitle political party committees to purchase such airtime at the LUC. And it should issue an accompanying injunction preventing the government from enforcing the LUC requirement in a manner at odds with the Constitution's commands. That relief will ensure that it is the "voters, not Congress," who will decide "which strengths should be permitted to contribute to the outcome of an election." *Davis v. FEC*, 554 U.S. 724, 742 (2008).

## PARTIES

7. The RNC is a "national committee" of the Republican Party, as defined by 52 U.S.C. § 30101(14). Its principal place of business is at 310 1st St. SE, Washington, D.C. 20003. The RNC is devoted to electing Republican candidates to federal office from across the United States, including in Texas. The RNC desires to engage in independent and coordinated expenditures on broadcast advertising time to promote its platform and support its candidates. The RNC is at a disadvantage in purchasing broadcast advertising time because it generally must pay whatever rates broadcast stations choose to charge, whereas FECA mandates that candidates receive the LUC when they purchase advertising time in the 60 days before a general election. That disadvantage burdens the RNC's "First Amendment rights to speak and coordinate [its] political activities freely." *NRCC*, 2026 WL 2618462, at *2. The RNC wants to buy broadcasting time at the LUC or at least to no longer labor under an unequal regime that distorts the electoral process, compels it to spend more each election cycle, and reduces its chances of victory. The RNC also wants to avoid any risk of campaign-finance liability governing the receipt of in-kind contributions in connection with accepting the LUC for its advertisements.

8. The RPT is a "State committee" of the Republican Party, as defined by 52 U.S.C. § 30101(15), and the Republican Party's primary committee in Texas. Its principal place of business is at 211 E. 7th St., #915, Austin, Texas 78701. The RPT is devoted to electing Republican candidates to state and federal office from across Texas, including in Amarillo. Each election cycle, including in 2026, the RPT makes expenditures to advocate for its platform and support its candidates. The RPT is at a disadvantage in purchasing broadcast advertising time because it generally must pay whatever rates broadcast stations choose to

charge it, whereas FECA mandates that candidates receive the LUC when they purchase advertising time in the 60 days before a general election. That disadvantage burdens the RPT's "First Amendment rights to speak and coordinate [its] political activities freely." *NRCC*, 2026 WL 2618462, at *2. The RPT wants to buy broadcasting time at the LUC—for both its independent advertisements and its coordinated advertisements in which it merely consults with a candidate—or at least to no longer labor under an unequal regime that distorts the electoral process, compels it to spend more each election cycle, and reduces its chances of victory. The RPT also wants to avoid any risk of campaign-finance liability governing the receipt of in-kind contributions in connection with the acceptance of the LUC from broadcasters.

9. Ronny Jackson is the sitting U.S. Congressman and 2026 Republican nominee for the U.S. House of Representatives from Texas's 13th Congressional District. He is a resident of Amarillo and is eligible to vote in any election for the office of the President of the United States. Representative Jackson has engaged in coordinated campaign advertising with the RPT in 2026, and he intends to continue to do so through advertisements he formally approves and advertisements on which he merely consults. Regardless of the outcome of the 2026 election, Representative Jackson intends to run for public office again in the future and to engage in coordinated advertising of both types with the RPT in doing so. By burdening his ability to engage in coordinated advertising with the RPT, the LUC requirement restricts Representative Jackson's exercise of his First Amendment rights. It also distorts the electoral process in which he participates, increases the costs of running his campaigns by forcing him to respond to additional advertisements, and harms his chances of victory.

10. Caroline Fairly is the sitting Representative and 2026 Republican nominee for the Texas House of Representatives for the 87th Texas House District. She is a resident of

Amarillo and is eligible to vote in any election for the office of the President of the United States. Representative Fairly has engaged in coordinated campaign advertising with the RPT in 2026, and she intends to continue to do so through advertisements she formally approves and advertisements on which she consults. Regardless of the outcome of the 2026 general election, Representative Fairly intends to run for public office again in the future and to engage in coordinated advertising of both types with the RPT in doing so. By threatening to burden her ability to engage in coordinated advertising with the RPT, the LUC requirement restricts Representative Fairly's exercise of her First Amendment rights. It also threatens to distort the electoral process in which she is a participant, increase the costs of running her campaigns by forcing her to respond to additional advertisements, and harm her chances of victory.

11. Jace Yarbrough is the 2026 Republican nominee for the U.S. House of Representatives for Texas's 32nd Congressional District. He is a resident of this judicial District and eligible to vote in any election for the office of the President of the United States. Mr. Yarbrough has engaged in coordinated campaign advertising with the RPT in 2026, and he intends to continue to do so through advertisements he formally approves and advertisements on which he consults. Regardless of the outcome of the 2026 general election, Mr. Yarbrough intends to run for public office again in the future and to engage in coordinated advertising of both types with the RPT in doing so. By burdening his ability to engage in coordinated advertising with the RPT, the LUC requirement restricts Mr. Yarbrough's exercise of his First Amendment rights. It also distorts the electoral process in which he is a participant, increases the costs of running his campaigns by forcing him to respond to additional advertisements, and harms his chances of victory.

12. Eric Flores is the 2026 Republican nominee for the U.S. House of Representatives for Texas's 34th Congressional District. He is a resident of Texas and eligible to vote in any election for the office of the President of the United States. Mr. Flores has engaged in coordinated campaign advertising with the RPT in 2026, and he intends to continue to do so through advertisements he formally approves and advertisements on which he consults. Regardless of the outcome of the 2026 general election, Mr. Flores intends to run for public office again in the future and to engage in coordinated advertising of both types with the RPT in doing so. By burdening his ability to engage in coordinated advertising with the RPT, the LUC requirement restricts Mr. Flores's exercise of his First Amendment rights. It also distorts the electoral process in which he is a participant, increases the costs of running his campaigns by forcing him to respond to additional advertisements, and harms his chances of victory.

13. The Federal Communications Commission (FCC) is a federal agency headquartered in Washington, D.C. that is charged with the civil enforcement of the LUC requirement. 47 U.S.C. § 503.

14. Defendant Brendan Carr is a Commissioner and Chairman of the FCC. As a Commissioner, he is responsible for the civil enforcement of the LUC requirement. He is sued solely in his official capacity.

15. Defendant Anna Gomez is a Commissioner of the FCC. As a Commissioner, she is responsible for the civil enforcement of the LUC requirement. She is sued solely in her official capacity.

16. Defendant Olivia Trusty is a Commissioner of the FCC. As a Commissioner, she is responsible for the civil enforcement of the LUC requirement. She is sued solely in her official capacity.

17. The Department of Justice is a federal agency headquartered in Washington, D.C. Attorneys within the Justice Department are responsible for the criminal enforcement of the LUC requirement and FECA's other requirements, including its provisions regulating in-kind contributions. 47 U.S.C. § 401; 52 U.S.C. § 30109(a)(5)(C), (d).

18. Defendant Todd Blanche is the Attorney General of the United States. He is responsible for the criminal enforcement of the LUC requirement and FECA's other requirements, including its provisions regulating in-kind contributions. 47 U.S.C. § 401; 52 U.S.C. § 30109(a)(5)(C), (d). He is sued solely in his official capacity.

19. The Federal Election Commission (FEC) is a federal agency headquartered in Washington, D.C. that is charged with the civil enforcement of federal campaign-finance laws, including FECA's provisions regulating in-kind contributions. *E.g.*, 52 U.S.C. §§ 30116(a), 30118.

20. Defendant Shana Broussard is a Commissioner and Acting Chair of the FEC. As a Commissioner, she is responsible for the civil enforcement of FECA. She is sued solely in her official capacity.

21. Defendant Dara Lindenbaum is a Commissioner of the FEC. As a Commissioner, she is responsible for the civil enforcement of FECA. She is sued solely in her official capacity.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this case arises under the Constitution and laws of the United States—specifically, the First Amendment and FECA. Plaintiffs have a statutory cause of action under 52 U.S.C. § 30110, under which the question of the constitutionality of FECA's lowest unit

charge requirement, 47 U.S.C. § 315(b)(1)(A), should be immediately certified to the Fifth Circuit sitting *en banc*. Plaintiffs also have an equitable cause of action to prevent unconstitutional action by federal officials. *See, e.g.*, *Trump v. Cook*, 609 U.S. 528, 549 n.2 (2026); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). This Court may grant declaratory, injunctive, and other appropriate relief under FECA, the Declaratory Judgment Act, the All Writs Act, Federal Rules of Civil Procedure 57 and 65, and the Court's inherent equitable powers. 28 U.S.C. §§ 1651, 2201, 2202; 52 U.S.C. § 30110; Fed. R. Civ. P. 57, 65.

23. Venue is proper in this District and Division under 52 U.S.C. § 30110 and 28 U.S.C. § 1391(e) because Defendants are federal agencies and federal officers acting in their official capacity; at least one Plaintiff resides in this District and Division; and a substantial part of the events giving rise to this case occurred in this District and Division. Specifically, Jackson and Fairly reside in this District and Division; Jackson, Fairly, and Yarbrough are running campaigns in this District; and the RNC, the RPT, Jackson, Fairly, and Yarbrough wish to purchase broadcast advertising time airing in this District and (for Jackson and Fairly) this Division in connection with political campaigns.

## BACKGROUND

### A. Congress enacts the LUC requirement.

24. Not all airtime is created equal. Broadcasters charge more for 30 seconds of advertising time during the evening news than during sitcom reruns at 3:00 a.m. Nor are all customers treated equally. Broadcasters charge different rates to different customers, offering discounts to frequent advertisers who purchase airtime in bulk. Political speakers—who rarely run campaign ads 365 days a year—may not benefit from those discounts, which can make communicating directly to voters during election season expensive.

25. Yet while Congress has regulated broadcasting since the first half of the 20th century, it did not command stations to give candidates special treatment until 1971. Instead, Congress's initial forays into this area were limited to ensuring candidates received equal treatment. In the early days of broadcasting, some stations charged candidates "'political' rates" that were "often twice the normal rate" charged to their commercial advertisers. *Hernstadt v. FCC*, 677 F.2d 893, 895 n.5 (D.C. Cir. 1980). Congress responded in 1952 by prohibiting broadcasters from charging candidates higher rates than those it charged for "'comparable use of such station for other purposes.'" *Id.* at 895; *see* 47 U.S.C. § 315(b)(1)(B).

26. Nearly 20 years later, however, Congress decided to shift from equal treatment to special treatment when it came to the rules for candidates' campaign ads. No longer content to go after "rate discrimination" against candidates, Congress in 1971 chose to target the "rates themselves." *Hernstadt*, 677 F.2d at 897. That was because the "catalyst for action" this time was "not a problem with the way rates were calculated," but a "concern about the increasing cost of election campaigns." *Id.* Fearing that "'the cost of campaigning, chiefly swollen by the cost of television, will exclude the honest poor,'" Congress cut candidates a break when it came to political advertising to ensure that "men of talent and interest, but not of means," would not be "discouraged from seeking office." S. Rep. No. 92-96 at 22 (1971).

27. To that end, Congress included a requirement that broadcasters give "preferential advertising rates to political candidates" within FECA's larger package of campaign-finance reforms. *Id.* at 28. Specifically, the Act's LUC requirement commands that in the 60 days before a general election (and the 45 days before a primary), any "charges made for the use of any broadcasting station by any person who is a legally qualified candidate for any public office in connection with his campaign … shall not exceed … the lowest unit charge of

the station for the same class and amount of time for the same period." 47 U.S.C. § 315(b)(1)(A). In short, this "additional break for candidates" requires each broadcasting station to provide them with the same "discount" it is "giving its most favored advertisers." *Hernstadt*, 677 F.2d at 897-98.

28. The LUC requirement is backed by stiff sanctions. Any broadcaster who *denies* the LUC to an eligible speaker could face a penalty of $25,000 per day, 47 U.S.C. § 503(b)(2)(A), or even criminal sanctions secured by the Justice Department, *id.* § 401(c).

29. Conversely, any broadcaster who *grants* the LUC to an ineligible speaker could face potential liability under other provisions of FECA. In addition to requiring the LUC, FECA also regulates federal political "contributions," which it defines to include "anything of value" given "by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A)(i). Under FEC regulations, "the term anything of value includes all in-kind contributions," such as "the provision of any goods or services … at a charge that is less than the usual and normal charge for such goods or services." 11 C.F.R. § 100.52(d)(1). Accordingly, a broadcaster's grant of the LUC to an ineligible speaker—such as a political party committee running independent campaign ads—might arguably qualify as a "contribution." FECA, however, limits how much money any single contributor may give to a political party committee. 52 U.S.C. § 30116(a). It also makes it unlawful for "any corporation"—including a broadcasting corporation—to make a "contribution" in connection with a federal election, *id.* § 30118(a), including a "gift" of "anything of value" to any "political party" specifically, *id.* § 30118(b)(2). Granting the LUC to a political party's independent campaign ads, for instance, could therefore expose a broadcaster to potential campaign-finance liability.

30. By the same token, a party committee could face liability under FECA for accepting the LUC for its ineligible advertisements. After all, FECA forbids party committees to "knowingly … accept or receive" a corporate "contribution." *Id.* § 30118(a). And as amended by the Bipartisan Campaign Reform Act of 2002, FECA also broadly prohibits national party committees from receiving any funds that do not comply with FECA's contribution limits, source prohibitions, and reporting requirements, as well as state party committees from using such funds in support of federal candidates. *Id.* § 30125(a)-(b).

31. Relying on these provisions, media buyers aligned with the Democrats recently threatened broadcasters that any "station that provides LUC rates to a political party committee … risks making an unlawful, unreported corporate in-kind contribution" under § 30118 on the theory that a "discount on advertising time can constitute an in-kind contribution."[2]

32. Access to the LUC gives candidates a significant advantage over others, as this year's primary runoff to be the Republican nominee for the contested Senate seat in Texas shows. According to records for Amarillo's ABC affiliate (KVII), LUC-ineligible advertisers paid up to 26% more than a candidate committee for comparable campaign ads. For example, one campaign paid $1,050 for a 30-second ad during the local evening news, while an ineligible advertiser paid $1,300 for a similar placement. The same campaign paid $950 for a 30-second ad in a Sunday evening news program, while the same ineligible advertiser paid $1,200 for a comparable spot. These prices arose on the same station, during the same period, and for materially comparable programming. The only difference was the LUC.[3]

[2] King & Perseke, *Re: Fourth Circuit Decision on Lowest Unit Charge Eligibility for Political Party and Joint Fundraising Committees*, https://perma.cc/8PQJ-6B39.

[3] *See* FCC Political File Record, *Texans for Senator John Cornyn* (May 18, 2026), https://perma.cc/TFK2-CGYJ; FCC Political File Record, *Texans for a Conservative Majority* (May 15, 2026), https://perma.cc/Q9BW-VVN5.

33. In other markets, the disparity can be far higher. Records from KTRK in Houston, for example, reveal that in the runup to the 2026 Senate runoff, LUC-ineligible advertisers paid $2,600 for 30-second placements during its 11:00 a.m. news program, 6.5 times more than the $400 paid by a campaign for comparable ads. Similarly, ineligible advertisers paid $2,200 to run ads during Jeopardy, while a campaign paid only $400. And during a football game aired in the Austin market last month, a pro-Paxton LUC-ineligible advertiser paid $450,000 for a single spot—nine times as much as the $50,000 the Talarico campaign had to pay for the same airtime.[4] More generally, the LUC is often anywhere from 3 to 13 times cheaper than the ordinary price of a campaign ad.[5] Sometimes, the difference is even greater. During the 2024 election, for instance, the LUC in Missoula was 25 times cheaper.[6]

**B. The FCC reads the LUC requirement to apply to some ads purchased by parties.**

34. For much of FECA's history, the effects of this regime on political parties were somewhat tempered by the FCC's understanding that at least some campaign ads purchased by political party committees would qualify as "the use" of a station by "a legally qualified candidate," just like a campaign committee's ads. 47 U.S.C. § 315(b)(1)(A). Initially, "the FCC viewed party ads as equivalent to candidate ads, and thus entitled to LUC." Nat'l Ass'n of Broadcasters, *Political Broadcast Catechism* 36 (16th ed. 2004), https://perma.cc/BZ95-C3HR. That was consistent with the government's general view at the time that "a party and

[4] *See* FCC Political File Record, *Cornyn Lonestar Victory Fund* (May 31, 2026), https://perma.cc/K4R7-XBG5; FCC Political File Record, *Texans for a Conservative Majority* (May 31, 2026), https://perma.cc/5DNU-YQKC; Sloan & Beaumont, *Can $1 Billion Power Republicans to Victory in the Midterms?*, AP (Oct. 7, 2026), https://perma.cc/4E94-FRDM.

[5] InsideRadio, *Supreme Court Clears Way for More Party Ads at Lowest Unit Rates* (July 1, 2026), https://perma.cc/8HQB-BLJU.

[6] Mutnick, *Senate Republicans Make Sudden Change in Ad Strategy amid Cash Crunch*, Politico (Oct. 2, 2024), https://perma.cc/6TMK-B47S.

its candidate are identical, *i.e.*, the party, in a sense, 'is' its candidates." *Colorado Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 622 (1996) (*Colorado I*) (plurality).

35. That changed in 1996, when the Supreme Court held that political party committees not only can engage in *independent* campaign spending—*i.e.*, expenditures that are not coordinated with a candidate—but also have a First Amendment right to do so without limit. *Id.* at 618-23. In the wake of that decision, "the FCC opined that, if a party expenditure is independent of the candidate, stations do not have to give the party the LUC." *Political Broadcast Catechism* 36. But while a party's "independent expenditures" did "not qualify for the lowest unit rates on the purchase of broadcasting time," a party's "coordinated spending" continued to be entitled to that discount. *FEC v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 470-71 (2001) (*Colorado II*) (Thomas, J., dissenting) (cleaned up); *see also FEC v. Colorado Republican Fed. Campaign Comm.*, 41 F. Supp. 2d 1197, 1210 (D. Colo. 1999) (noting that the government "admitted" that "independent expenditures do not qualify for the lowest rates on the purchase of broadcasting time, as coordinated expenditures would") (cleaned up).

36. In March 2026, the FCC's Media Bureau issued guidance reiterating this position. Specifically, it "remind[ed] broadcasters" that while "[a]dvertising time purchased by political parties as an independent expenditure is not entitled to LUC," "candidate-party coordinated advertisements are." *FCC Media Bureau Provides Guidance on Entitlement to Lowest Unit Charge for Legally Qualified Candidates for Federal Office and All Authorized Committees*, DA 26-300, 2026 WL 1013722 (Mar. 30, 2026) (Guidance).

37. The FCC's interpretation did not help parties much, however, because another FECA provision, 52 U.S.C. § 30116(d), strictly "limited" the amount of "coordinated" expenditures a party could make at all, thereby severely "inhibiting party speech." *Colorado II*,

533 U.S. at 471 (Thomas, J., dissenting). Those "caps on coordinated expenditures are set so low in comparison with a campaign's total expenses as to make that spending stream inconsequential," such that "party-coordinated expenditures in House races have never exceeded 1% of total campaign spending." *NRSC*, 609 U.S. at 947 (Kagan, J., dissenting). In June 2026, the Supreme Court finally held that those restrictions on party-candidate speech "violate the First Amendment." *Id.* at 914 (majority).

**C. Democratic candidates and their allies seek to deny parties access to the LUC.**

38. Around the time the Supreme Court issued its decision in *NRSC*, four Democratic candidates for Congress challenged the FCC Media Bureau's Guidance in the Fourth Circuit, arguing that "'*only* candidates or their authorized campaign committees are entitled to the LUC.'" *Brown v. FCC*, 189 F.4th 362, 378 (4th Cir. 2026); *see id.* at 370. The NRCC and NRSC intervened to defend the Guidance alongside the FCC, but the Fourth Circuit agreed with the challengers and vacated the Guidance over Judge Wilkinson's dissent. *Id.* at 368.

39. The Supreme Court stayed the order, concluding that "the Fourth Circuit likely lacked statutory jurisdiction to address" the Democrats' lawsuit because the FCC had yet to resolve their administrative challenge to the Guidance. *NRCC*, 2026 WL 2618462, at *2. The Court also determined that a stay was necessary to prevent irreparable harm to the NRCC and NRSC in the interim, observing that the denial of the LUC "will require the party committees to pay more for advertising space, thereby hampering their efforts to reach the electorate in the critical weeks leading up to the midterms." *Id.* That "injury" to "their First Amendment rights to speak and coordinate their political activities freely" could not be remedied after the election with "refunds or reimbursements." *Id.* (citing *NRSC*, 609 U.S. at 914-19). Only Justice Jackson noted her dissent. *Id.*

40. In defending the Guidance before the Supreme Court, the government took the position that the LUC requirement "does not cover advertising by the party after mere consultation with the candidate," even though that is unquestionably party "'coordinated'" speech. *NRCC* Br. 26-27. Instead, it claimed that the LUC is "limited to coordinated advertising … announcing the candidate's approval in the advertisement itself," on the theory that only those ads are "a use" of the station "by the candidate himself." *Id.*

41. And Democrats are still trying to eliminate the LUC for even those coordinated advertisements. After the Supreme Court's ruling in *NRCC*, the Fourth Circuit, again over Judge Wilkinson's dissent, granted the Democratic challengers' request to issue a writ of mandamus compelling the FCC to issue a final order they could then challenge. *In re Brown*, 2026 WL 3017599 (4th Cir. Oct. 7, 2026). The Supreme Court again issued a stay. *FCC v. Brown*, 2026 WL 3080098 (U.S. Oct. 14, 2026).

## CLAIM FOR RELIEF

### Violation of the First Amendment to the United States Constitution

42. Plaintiffs hereby reallege and incorporate by reference each of the foregoing allegations as if set forth herein.

43. The First Amendment commands that "Congress shall make no law … abridging the freedom of speech." U.S. Const. amend. I. Among other things, this constitutional guarantee serves as "'a kind of Equal Protection Clause for ideas'" in that it generally prohibits the government from "favoring" certain messages and "discriminating against" other ones. *Barr v. Am. Ass'n of Pol. Consultants*, 591 U.S. 610, 632 (2020) (*AAPC*) (plurality).

44. The same goes for discrimination against *speakers*. "The First Amendment protects speech and speaker, and the ideas that flow from each." *Citizens United*, 558 U.S. at 341;

*see AAPC*, 591 U.S. at 619 (plurality) (dismissing objection that the challenged law "draws distinctions based on speakers" rather than "content" as beside the point). Courts therefore must be "deeply skeptical of laws that distinguish among different speakers"—whether the disfavored speakers are crisis pregnancy centers, pharmaceutical detailers, corporations, or others. *NIFLA*, 585 U.S. at 777-78 (cleaned up); *see Sorrell*, 564 U.S. at 563-68; *Citizens United*, 558 U.S. at 350-51.

45. That is especially so when *political* speech is involved. The Supreme Court has rejected the idea that "in the context of political speech, the Government may impose restrictions on certain disfavored speakers." *Citizens United*, 558 U.S. at 341. That principle reflects the fact that "the First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office.'" *Id.* at 339 (cleaned up). For this reason, "[l]aws that burden political speech are 'subject to strict scrutiny,'" including ones that burden political speech selectively. *Id.* at 340. In short, "the First Amendment generally prohibits the suppression of political speech based on the speaker's identity." *Id.* at 350; *see Time Warner Cable Inc. v. FCC*, 729 F.3d 137, 159-60 (2d Cir. 2013) (taking *Citizens United* to "compel strict scrutiny of all speaker-based preferences" in "the political-speech context").

46. Obviously, all this means Congress cannot *prohibit* political expression on the basis of a speaker's wealth, corporate structure, or other feature of its identity. *Citizens United*, 558 U.S. at 350. But the First Amendment's protections go beyond outright bans to identity-based *burdens* on political speakers as well. After all, the "'distinction between laws burdening and laws banning speech is but a matter of degree,'" including when a "speaker-based financial burden" is involved. *Sorrell*, 564 U.S. at 565-66.

47. In *Davis*, for instance, the Court struck down a law that raised contribution limits for candidates whose opponents spent over $350,000 in personal funds, thereby discriminating against self-funded candidates. 554 U.S. at 736, 744. While that law did "not impose a cap on a candidate's expenditure of personal funds," it did impose a "penalty on any candidate who robustly exercises that First Amendment right" by giving another speaker—his opponent—"fundraising advantages … in the competitive context of electoral consequences." *Id.* at 738-39. Because these "discriminatory contribution limits" placed "a substantial burden on the exercise of the First Amendment right to use personal funds for campaign speech," it triggered, and failed, strict scrutiny. *Id.* at 740; *see id.* at 741-44.

48. The Court took a similar approach in *Bennett*, where it invalidated an Arizona law that discriminated against "privately financed candidates" and their allies. 564 U.S. at 741. Specifically, that law gave publicly financed candidates funds to roughly match every dollar spent by a privately financed opponent and the groups supporting him. *Id.* at 737. While that framework did "not directly cap[]" anyone's speech, it still "substantially burdened" the expression of privately financed candidates and their allies by threatening to drown out their voices. *Id.* at 735. So strict scrutiny applied. *Id.* at 748; *see Time Warner*, 729 F.3d at 159 (noting *Bennett* subjected a "speaker-based law that regulated political speech to strict scrutiny").

49. FECA's lowest unit charge requirement is more of the same. It severely burdens the political speech of two sets of speakers while favoring others.

50. *First*, the LUC requirement discriminates against *parties* on its face by requiring them to pay more for campaign advertisements in the runup to an election than candidates do. If a candidate's *campaign* committee wants to run an ad championing that candidate in the 60 days before an election, FECA compels the broadcaster to give that committee "the

lowest unit charge" for its speech. 47 U.S.C. § 315(b)(1)(A). If a *party* committee, however, wants to run its own ad criticizing the same candidate during the same time, the discount disappears. In other words, "certain disfavored associations of citizens"—those who have banded together as a political party—"are penalized for engaging in the same political speech" as those who have not. *Citizens United*, 558 U.S. at 356. That is speaker-based discrimination, plain and simple. *Id.*; *see also id.* at 392 (Scalia, J., concurring) ("[T]he individual person's right to speak includes the right to speak *in association with other individual persons.*").

51. And it is one that has a severe impact. Due to the dramatic disparities in campaign-ad prices it generates, the LUC requirement significantly diminishes the relative voice of party committees in the political arena. In the zero-sum world of politics, granting a state-mandated discount to only candidate *campaign* committees necessarily burdens the *party* committees denied it. *See Bennett*, 564 U.S. at 747 (noting that "[o]f course" a law giving "additional funds" to a privately financed candidate's "opponents" makes his speech "less effective"). After all, a political party purchasing tens of millions of dollars in advertising will reach far fewer voters if it must routinely pay rates far higher than those charged to similarly situated campaign committees. That is why the Supreme Court recently observed that the LUC requirement burdens party committees' "First Amendment rights" by forcing them "to pay more for advertising space, thereby hampering their efforts to reach the electorate in the critical weeks" before an election. *NRCC*, 2026 WL 2618462, at *2.

52. *Second*, the LUC requirement discriminates against *candidates* who want to exercise their constitutional right to "consult[] with" their party "about the content, timing, or placement" of a party "advertisement in support" of them. *NRSC*, 609 U.S. at 917-18. If a candidate consults with his *campaign* committee on that committee's advertising strategy, he

benefits from the LUC requirement. But if the same candidate consults with his *party* committee on that committee's advertising strategy, this federally required price cut vanishes. So just like the laws struck down in *Davis* and *Bennett*, the LUC requirement "imposes an unprecedented penalty on any candidate who robustly exercises his First Amendment rights," and any party committee that dares to do so as well. *Bennett*, 564 U.S. at 736 (cleaned up).

53. In that sense, the "anti-party discriminatory LUC" requirement is just "FECA's indirect strike against" the same "party-coordinated speech" that the Supreme Court just held Congress could not attack directly. *Brown*, 189 F.4th at 398 (Wilkinson, J., dissenting). *NRSC* makes clear that the First Amendment would prohibit "any law that told candidates, 'You may not speak in coordination with your party'" or that imposed "expenditure limits on that speech.'" *Id.* Yet the LUC requirement imposes "an indirect version of that same burden by penalizing candidates for favoring collaborative speech over solo self-promotion." *Id.* But "[w]hat the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 77-78 (1990).

54. These speaker-based burdens in turn "distort the political system." *NRSC*, 609 U.S. at 935. Denying the LUC to political parties in particular—entities whose "formation … was almost concurrent with the formation of the Republic itself"—skews campaign speech in multiple respects. *California Democratic Party v. Jones*, 530 U.S. 567, 574 (2000); *see also NRSC*, 609 U.S. at 936 n.6 ("[P]olitical parties possess an especially strong First Amendment interest in working together with their candidates and making expenditures on political speech in coordination with their candidates.").

55. To start, it suppresses the unique perspective of parties, whose "interests are broader and more dispersed" than "simply the campaign of one candidate." *NRSC*, 609 U.S. at 924. After all, "[p]olitical systems that blend and draw upon individual and collective speech"—"the party and the maverick"—"are healthier in First Amendment terms than those that prize a single element of speech alone." *Brown*, 189 F.4th at 398 (Wilkinson, J., dissenting). Yet the LUC requirement places a heavy thumb on the scale in favor of candidates, thereby amplifying the voices of individualists over institutions.

56. Even worse, the LUC requirement also privileges one party's candidates—Democrats. Congress's speaker-based advertising discount overwhelmingly favors "Democratic candidates," who generally enjoy a "significan[t] … cash advantage … over their Republican counterparts."[7] Republican candidates, by contrast, have a substantial edge when it comes to their party resources. Right now, the DNC's debts exceed its cash on hand, whereas the RNC enjoys an approximately $130 million surplus.[8] Democrats are therefore quite open about the fact that by banning the use of "party committee money for lowest unit charge ads," the LUC requirement provides them with "a fundamental advantage in the midterms." Barber & Merz, *supra*. The First Amendment, however, does not permit "Congress to use the election laws to influence the voters' choices" by "making and implementing judgments about which strengths should be permitted to contribute to the outcome of an election." *Davis*, 554 U.S. at 742. For all these reasons, the LUC requirement "'burden[s] political speech'" and is therefore "'subject to strict scrutiny.'" *Bennett*, 564 U.S. at 734.

[7] Lopez et al., *4th Circuit Issues Huge Ruling Undermining Republican Strategy This Cycle*, Elias Law Group (Aug. 25, 2026), https://perma.cc/EEF4-DJPA.

[8] Jira, *Democrats Remain Far Behind GOP in Cash on Hand as Midterms Near*, Wash. Post (Aug. 21, 2026), https://perma.cc/Y5AV-ZERV.

57. To survive strict scrutiny, the government must establish that the LUC requirement both "'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Id.* And it must do so on the basis of "Congress's original justification[s]" for the law, not "'*post hoc*'" theories invented "'in response to litigation.'" *NRSC*, 609 U.S. at 921. That is "'the most demanding test known to constitutional law,'" and the government cannot begin to satisfy it here. *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 484 (2025). That is because Congress enacted the LUC requirement to advance two objectives, neither of which is even a legitimate government interest, let alone a compelling one. *See* S. Rep. No. 92-96 at 20.

58. *First*, Congress included the LUC requirement in FECA as part of a larger effort "to halt the spiraling cost of campaigning for public office." *Id.*; *see KVUE, Inc. v. Moore*, 709 F.2d 922, 935 (5th Cir. 1983) (noting FCC's recognition of this point), *aff'd sub nom. Texas v. KVUE-TV, Inc.*, 465 U.S. 1092 (1984). But as the Supreme Court reiterated just months ago, "'reducing'" what incumbents deem "'wasteful and excessive campaign spending'" is "a flatly impermissible basis" for burdening political speech. *NRSC*, 609 U.S. at 921.

59. *Second*, Congress enacted the LUC requirement to impose its vision of a level playing field on American elections by giving cash-strapped "candidates for public office greater access to the media so that they may better explain their stand on the issues" while denying the same discount to wealthier political parties. S. Rep. No. 92-96 at 20; *see KVUE*, 709 F.2d at 935 (noting FCC's recognition of this point). Concerned that "'the cost of campaigning, chiefly swollen by the cost of television, will exclude the honest poor,'" Congress cut candidates a break "so that the electorate might be better and more widely informed" of the views of "'men of talent and interest, but not of means.'" S. Rep. No. 92-96 at 22-23.

60. In other words, "to ensure that the political speech of the wealthy not drown out the speech of others," Congress sought "to equalize the relative ability" of different speakers "to influence elections." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994) (cleaned up). But is not for Congress to decide whose speech the public should hear more of and whose less. *Davis*, 554 U.S. at 742. To the contrary, a legislative desire "to level the electoral playing field, or to enhance or diminish the relative influence of certain groups or views" is "entirely inadequate under the First Amendment." *NRSC*, 609 U.S. at 921. Congress's "apparent concern that political parties otherwise could exercise outsized influence in political campaigns" is therefore no reason to reduce their First Amendment rights. *Id.* at 934.

61. In any event, the level of scrutiny question here is "academic" because the LUC requirement cannot survive even intermediate scrutiny. *Id.* at 920. To satisfy intermediate scrutiny, the government must still show that the LUC requirement is "'narrowly tailored'" to furthering "'a sufficiently important interest.'" *Id.* And the government has *no* legitimate interest in burdening political speech in order to "'reduce the amount of money in politics'" or to "'level the electoral playing field.'" *Id.* at 921; *see also Davis*, 554 U.S. at 740 n.7. That is enough to dispatch FECA's "anti-party discriminatory LUC scheme": "Whatever the correct level of scrutiny, there is simply no government interest that could justify an indirect version of the burdens on 'the important and traditional role of political parties during campaigns' the Supreme Court already invalidated." *Brown*, 189 F.4th at 398 (Wilkinson, J., dissenting) (quoting *NRSC*, 609 U.S. at 918).

62. All of this "is unsurprising," for "the LUC statute was passed as part of … FECA" alongside the Act's "direct limits" on political speech. *Id.* at 395. Indeed, Congress deliberately paired FECA's mandate for "[r]educed rates to candidates" with the Act's

"spending limitation" so that the LUC would not "be a bonanza" only to "those who have access to vast financial resources." S. Rep. No. 92-96 at 29. And FECA's other burdens on core political speech—including its amendments—have not fared well. In case after case, the Supreme Court has held that these provisions of FECA defy the First Amendment. *E.g.*, *Buckley v. Valeo*, 424 U.S. 1, 143 (1976) (limits on independent expenditures by individuals and certain groups; expenditure caps for candidates; limits on candidates' use of personal funds); *FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 263 (1986) (limits on independent expenditures for certain nonprofit corporations); *Colorado I*, 518 U.S. at 608 (plurality) (limits on party independent expenditures); *Davis*, 554 U.S. at 743 (heightened contribution limits for candidates whose opponents spent over $350,000 of personal funds); *Citizens United*, 558 U.S. at 365-66 (limits on independent expenditures by corporations and labor unions); *McCutcheon*, 572 U.S. at 193 (plurality) (limits on aggregate contributions); *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 293-94, 313 (2022) (limits on repayment of candidate loans using post-election contributions); *NRSC*, 609 U.S. at 938 (limits on party coordinated expenditures).

63. In sum, 47 U.S.C. § 315(b)(1)(A) defies the First Amendment by unjustifiably burdening Plaintiffs' "rights to speak and coordinate their political activities freely." *NRCC*, 2026 WL 2618462, at *2.

64. Because "Congress violated th[e] First Amendment equal-treatment principle … by favoring" candidate campaign ads and "discriminating against" party campaign ads in the LUC requirement, this Court must decide whether to extend that mandate's benefits to political parties or nullify its benefits for everyone. *AAPC*, 591 U.S. at 632 (plurality). Generally, the preference is "for extension rather than nullification." *Id.* There is no reason to depart from that presumption here. Extending the LUC to parties in addition to candidates is a

modest change that corrects the LUC requirement's unconstitutional discrimination while furthering Congress's underlying interest in increasing political speech.

65. In any event, either response to the discrimination here—extension of the LUC to party committees or the elimination of the LUC for candidates—is preferable to the unconstitutional *status quo*. While Plaintiffs prefer a solution that would allow more speech, a ruling that would ensure no one has access to the LUC—candidates included—would at least redress Plaintiffs' "First Amendment injury" of suffering "unequal treatment of speech," especially where that disparity substantially favors their "competitor[s]" in the contest for votes. *Id.* at 634 & n.13; *see id.* at 634-35 ("a plaintiff who suffers unequal treatment has standing to seek 'withdrawal of benefits from the favored class'"). One way or another, the LUC requirement cannot be applied to let Congress's speaker preference dictate the outcome of elections any longer. *See Davis*, 554 U.S. at 742.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court:

a. Declare that 47 U.S.C. § 315(b)(1)(A), to the extent it entitles only candidates and not political party committees (whether independently or in coordination with candidates) to purchase broadcast political advertising time at the LUC, violates the First Amendment to the United States Constitution and is therefore unenforceable unless it is enforced to likewise entitle political party committees to purchase such airtime at the LUC;

b. Enjoin Defendants and their officers, agents, servants, and employees from enforcing 47 U.S.C. § 315(b)(1)(A) in a manner that entitles candidates to purchase political broadcast advertising time at the LUC but excludes (any independent or coordinated) airtime purchases by the RNC and RPT from such entitlement;

c. Enjoin Defendants and their officers, agents, servants, and employees from pursuing any enforcement action related to in-kind contributions against broadcasters who offer advertising time to political parties at the LUC or against the RNC and the RPT if they accept such advertising time at the LUC rate under 52 U.S.C. §§ 30104(b), 30116(a)(1)(B), (D), 30118(a), 30125(a), (b);

d. Enter judgment in favor of Plaintiffs;

e. Award Plaintiffs their costs and attorney's fees pursuant to any applicable statute or authority; and

f. Grant any other relief as the Court in its discretion deems just and appropriate.

October 28, 2026

Respectfully submitted,

*/s/ John C. Sullivan*

John C. Sullivan (Texas Bar 24083920)
Cliff P. Riley (Texas Bar 24094915)
S|L Law PLLC
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX 75104
Tel: (469) 523-1351
john.sullivan@slfirm.com
cliff.riley@slfirm.com

Brinton Lucas (D.C. Bar 1015185)*
John M. Gore (D.C. Bar 502057)*
E. Stewart Crosland (D.C. Bar 1005353)*
Anthony J. Jeffries (D.C. Bar 1736428)*
Elise Kostial (D.C. Bar 90022632)*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Tel: (202) 879-3939
Fax: (202) 626-1700
blucas@jonesday.com
jmgore@jonesday.com
scrosland@jonesday.com
ajjeffries@jonesday.com
ekostial@jonesday.com

* *Pro hac vice* applications forthcoming

*Counsel for Plaintiffs*